**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ROBERT KIESINGER AND RONALD RUSSELL,**

                                        **Plaintiffs,**

                                                                **5:00-CV-1356**
**v.**                                                          **(NAM/GHL)**


**MEXICO ACADEMY AND CENTRAL SCHOOL;**
**THE SCHOOL BOARD OF THE MEXICO**
**ACADEMY AND CENTRAL SCHOOL,**
**in their respective official capacities; and**
**ROBERT DiFLORIO, the SCHOOL**
**SUPERINTENDENT OF THE MEXICO ACADEMY**
**AND CENTRAL SCHOOL, in his official capacity,**

                                        **Defendants.**
_____

**APPEARANCES:**                                    **OF COUNSEL:**

Office of Thomas Marcelle                        Thomas Marcelle, Esq.
2 E-Comm Square
3rd Floor
Albany, NY 12207
_For Plaintiffs_

Office of Frank W. Miller                        Frank W. Miller, Esq.
6296 Fly Road
East Syracuse, NY 13057
_For Defendants_

**Norman A. Mordue, Chief Judge:**

                        **MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

          Plaintiffs Robert Kiesinger and Ronald Russell filed this action against defendants Mexico

Academy and Central School, the Mexico Academy School Board, and Robert DiFlorio,

Superintendent ("defendants" or "Mexico Academy"), pursuant to 42 U.S.C. § 1983 on the

grounds that defendants violated the Establishment Clause and their First Amendment right to Freedom of Speech and Free Exercise of Religion when they removed or excluded plaintiffs' bricks, which contained inscriptions referring to Jesus, from the brick walkway in front of the Mexico Academy High School in Mexico, New York.  Plaintiffs also assert that defendants violated their rights under Art. 1, § 3 of the New York Constitution.  Presently before the Court are the parties' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]  Plaintiffs, alternatively, seek a preliminary injunction.[2]

## II.      FACTUAL BACKGROUND

The facts, unless otherwise noted, are undisputed.  During the 1996-1997 school year, the Class of 1999, Superintendent Michael Havens, and the School Board, commenced a plan to sell bricks to Mexico Academy community members to raise money to fund both the Class of 1999's senior class trip to Disney World and the construction of a 2,000 square feet walkway in front of the high school.  No obscene or vulgar messages were permitted.  Superintendent Havens stated that "love interest" messages were also prohibited.  Mexico Academy issued two order forms and advertisements which described the project.  The first form introduced the brick sale as follows:

> The Mexico High School Class of 1999 has undertaken the reconstruction of the front sidewalk at the High School.  Plans are underway to re-pave the entire sidewalk from Route 104 to the front steps of the High School.  The bricks are dark red to help bring back the nostalgia of when the school was first built.  It is anticipated that the majority of the bricks will have inscriptions on them of: alumni, present students, community

---

[1] Although defendants move for summary judgment dismissing the complaint in its entirety, they advance no arguments regarding plaintiffs' Establishment Clause, Free Exercise, and New York State Constitution claims.  Likewise, plaintiffs' opposition and cross-motion papers solely concern their Free Speech claim.  The Court therefore does not address plaintiffs' Establishment Clause, Free Exercise, and New York State Constitution claims.

[2] The Court previously denied plaintiffs' motion for a preliminary injunction. *See Anderson v. Mexico Academy and Central School*, 186 F.Supp.2d 193 (N.D.N.Y. 2002).

organizations, and area businesses.  The project will be funded primarily by the sale of the bricks.

Each brick measures 4" by 8" and may contain up to three lines of text.  The bricks will be installed for the beginning of the 1997 school year.  You may purchase a brick with your name inscribed with up to 14 characters in it, and have it placed in the front of the High School for only $25.00.

The second form states in relevant part:

The Mexico Academy Educational Foundation will be continuing the reconstruction of the front sidewalk at the high school.  This project was started by the Class of 1999.  The paving bricks, many of which are individually engraved, have made a striking improvement in an already beautiful building.

Engraved bricks can be purchased for $30 each by completing the information at the bottom and on the reverse side of this form.  A personalized "commemorative certificate" will be sent for each brick purchased.  The certificate is suitable for framing and makes the inscribed bricks excellent birthday, Christmas, or graduation gifts.

Become a permanent part of the Mexico district community by purchasing a brick.  Hurry before they are all sold out!

Inscription Examples

| Example 1 | Example 2 | Example 3 |
|-----------|-----------|-----------|
| Jane Doe | Jane Doe | Jane Doe |
| Class of 1976 | I made it! | Riley |

At the time of purchase, individuals could select where in the walkway they wished their bricks to be placed.

Plaintiff Ronald Russell, pastor of the Mexico Church of God, purchased five bricks through his son, who was a member of the Class of 1999.  These bricks were inscribed: "Jesus Saves!, Joshua Russell", "Ye Must Be Born Again, Jesus Christ", "Jesus Christ The Only Way!, Rev. Ron Russell", "Jesus Loves You, Susie Russell", and "Jesus Christ is Lord, Rev. Ron

3

Russell".  Plaintiffs' Exhibit Q, p. 43.  According to Mexico Academy, Mr. Russell purchased two additional bricks inscribed "Jesus Saves" and "Ye Must Be Born Again!".  Defendants' Exhibit E.  Plaintiff Robert Kiesinger purchased a brick inscribed "Jesus Saves, John 3:16".  *Id*. at p. 38.  Two other individuals purchased bricks which were later removed, but neither is a party to this action.[3]

There are 1,736 bricks in the walkway.  Most are inscribed with an individual's name and the year of their class, but many contained other expressions:

> "College of New Rochelle, Dream Think Become" Exhibit Q at p. 4; "Daemen College Tradition Vision – Success" Exhibit Q at p. 4; "Samuel Carioti, Class of 1991, To Be or Not To Be" Exhibit Q at p. 3; "Never Drive Your Angels Faster Than Can Fly, Kellogg Memorials Est. 1898" Exhibit Q at p. 13; "Marilyn Laws, If You Think You Can You Can" at Exhibit Q at p. 40; "A Wild Life is Not Without Wildlife, Tye@Class of 1985" Exhibit Q at p. 36; ""Fred H. Williams, class-49, Semper Fi" Exhibit Q at p. 42; "Oscar Cronk 60, 'Where Angels Feared…'" Exhibit Q at p. 39.  "Love Your Daughter, Kaitlyn" Exhibit Q at p. 2; "Welcome to America, RoseAnn-Citizen 97, We Love You!" Exhibit Q at p. 19; "David J. Knopp Best Son Ever!, I Love You, Mom" Exhibit Q at p. 13; "Lillian Duger, From your girl, I Love You!" Exhibit Q at p. 5; "Howard R. McLymond, Class of 1951, Happy Father's Day" Exhibit Q at p. 25; "To My Girls Nicole & Kristin, Love you Dad" Exhibit Q at p. 26; "Ken-Dol Douglas, In Loving Memory of My Wife Dolores" Exhibit Q at p. 32; "Dedicated in Honor of My Dad, James R. McElravy" Exhibit Q at p. 43. "Go Yanks-Dolphins, Heat-Marlins-Canes, Panthers-Orangemen" Exhibit Q at p. 34. "James Gracey, Class of 1988, Amazing Grace" Exhibit Q at p. 9; "In God We Trust, The Roaricks', George Lona Mike" Exhibit Q at p. 29; "Rev. Myrna Foster, and John Methodist Church Mexico NY" Exhibit Q at p. 33;  "George M. Wise, Class of 1948, Praise God" Exhibit Q at p.28; "God Bless You, FR Wirkes, St. Mary Church". Exhibit Q at p. 35.

After Mr. Kiesinger's brick was installed, Superintendent Havens received a telephone call from the high school assistant principal regarding whether Mr. Kiesinger's brick was "a problem."  Superintendent Havens testified that he recalled being concerned about the separation

---

[3] Their bricks stated "Jesus Christ Lord" and "Jesus Christ is Lord of this School".  As stated, the individuals who purchased these bricks are not parties to this action, therefore the propriety of the removal of these bricks is not squarely before the Court.

of church and state and that he asked the assistant principal to move it to a more inconspicuous place.  After speaking with counsel, Mr. Kiesinger's brick was moved to a "more prominent place".  Superintendent Havens stated that he decided to keep Mr. Kiesinger's brick in the walkway because he was concerned that its removal "would cause real distress for the community".

Plaintiffs maintain that the controversy over their bricks stems from complaints by one community member, Elizabeth Passer.  Ms. Passer complained that the bricks violated "separation of church and state" and that she was concerned about the "specific references to a Christian God".  Superintendent Havens testified that he received complaints from other community members as well, including one from an individual who was concerned about people walking on bricks that said Jesus.  Mexico Academy received an inquiry from the office of United States Senator Charles Schumer about the bricks referring to Jesus.  In October 1998, in an attempt to quell the controversy, Mexico Academy passed a resolution to place the following inscription in the walkway:  "The messages on this walk are personal expressions and contributions of the individuals of Mexico Academy and Central School community."  Mexico Academy placed the 18" x 12" disclaimer in the front center of the walkway, approximately 10 feet from the school's entrance.

Despite the disclaimer, Ms. Passer continued to complain that the religious bricks were an endorsement of religion.  On January 20, 2000, Mexico Academy wrote a letter to Ms. Passer stating:

> This letter is in response to your letter . . . stating your feelings that some of the bricks in the High School walkway were objectionable to you because of a religious content.  Furthermore, you stated that such bricks with a religious statement are "sending a

message that anyone not of that belief system is not valued as much by the school district."

Your concerns were discussed in executive session in the Board meeting of January 13th. We discussed it in executive session because of our need to ask for legal counsel on this matter. After some discussion, and in consultation with the District's attorney, we decided to convey the following messages to you:
1.      With all due respect, we do not agree with your feelings on this issue and do not wish to continue this debate with you. We have spent an inordinate amount of time on this issue over the past two years.
2.      We stand by our previous decision and the [disclaimer] that was carved and placed into that walk . . . .
3.      Please feel free to order bricks for this walkway that convey your celebration of our community and that represents your beliefs.

Your request for information on "purchase orders" regarding the bricks, under the Freedom of Information Act was handled by the District through the appropriate administrative process and persons responsible for answering such requests.

Plaintiffs' Exhibit W.

The parties agree that Ms. Passer, unsatisfied with Mexico Academy's response, contacted the American Civil Liberties Union, which, in turn, threatened to sue Mexico Academy. Defendants contacted legal counsel who advised that bricks which referred to a particular God, suggesting the exclusion of others, offended N.Y. Educ. Law § 414 and the Constitution. On February 10, 2000, Mexico Academy passed a resolution "to have all bricks in the high school sidewalk removed if they contained any political or religious messages." Defendants removed those bricks which referred to a particular God, *i.e.*, Jesus, but allowed bricks which referred to "God" to remain, since those bricks did not refer to a particular religion and "God" was a universal term.

In a letter dated March 8, 2000, the Superintendent wrote plaintiffs a letter explaining that their bricks had been removed from the walkway:

6

I am writing you regarding the bricks you purchased for the front of the high school . . . . As you might be aware there has been a fairly vocal complaint about bricks which contain the word "Jesus". As a result of that continuing complaint and a resulting inquiry from Senator Schumer's office we asked our attorneys about our legal right to keep the bricks as part of our sidewalk.

We have been informed that bricks which promote a particular religion cannot legally be part of the sidewalk. Bricks which speak about God are acceptable since they do not refer to a particular religion. Bricks such as yours, which include the word Jesus, are prohibited in publicly funded schools since they promote a particular religion (Christianity).

I regretfully inform you that we have therefore reluctantly removed your bricks. I apologize for any distress this causes you. I hope you understand that as school officials we swear an oath to obey the Constitution and the current laws of the land. Our counsel tells us that the Supreme Court's current interpretation of separation of Church and State prohibits us from keeping your bricks.

We would be happy to reinscribe your bricks or return your money. Enclosed is a new form and stamped envelope. Please let me know which you prefer.

Again I am sorry to have to inform you of this matter.

Plaintiffs' Exhibit X.

Pursuant to the new policy, Mexico Academy refused an individual's request to purchase a brick with the inscription "Keep Abortion Legal", and Mr. Russell's request for a brick inscribed "Jesus loves you, Ron Russell".

Prior to the brick sale, Mexico Academy has always employed a policy of editing and

limiting verbal and written expression in the schoolhouse pursuant to its Community Use policy[4]

_____

[4] Mexico Academy's Community Use policy states in pertinent part:

School facilities may be used by community groups and non-school organizations when such uses do not interfere with school programs or activities. For purposes of this policy, facility is designed to include a school building, or school grounds, including athletic fields. School District-sponsored activities have priority over uses by community groups, and non-school organizations on any given date. It is understood by all applicants that School District-sponsored activities may make it necessary to cancel or postpone previously approved applications. Community groups and non-school organizations shall make application for the use of a District facility directly to the Building Administrator . . .. Final approval will be made by the Board of Education unless said responsibility is delegated to the superintendent.

Permissible Use of School Facilities

School facilities may be used for the following purposes:

a)      for instruction in any branch of education, learning, or the arts;
b)      for public library purposes;
c)      for a social, civic or recreational meeting or activity which is open to the general public;
d)      for meetings and other uses pertaining to the welfare of the community, and open to the general public;
e)      for meetings, entertainment and other occasions provided that:

      1)      The proceeds from any admissions are expended for an educational or charitable purpose, and
      2)      such meeting, entertainment or occasion is not under the exclusive control of a religious sect or denomination, or of a fraternal, secret or exclusive society or organization other than veterans of the United States military, Navy or Marines or volunteer firefighters, ambulance workers, and

f)       for classes of instruction for educationally disabled minors operated by a private organization approved by the Commissioner of Education;
g)      for recreation, physical training, and athletics;
h)      for child care services during non-school hours, provided the cost of the care is not a School District charge and is to be paid by the person responsible for the support of the child, local social services agency, or any other public or private voluntary source. The terms and conditions of such use shall be determined by the Superintendent of Schools.
i)       for graduation exercises held by not-for-profit elementary and secondary schools, provided that no religious service is performed.

School facilities may not be used for a private or commercial activity. The intent is to provide community based program [sic] and be open to the public.

No outside organization or group may be allowed to conduct religious services or religious instruction on school premises before, during or after school hours. However, the use of school premises by outside organizations or groups after school for the purposes of discussing secular subjects from a religious viewpoint is permissible.

8

and N.Y. Educ. Law § 414.[5]

## III.    DISCUSSION

### A.    Summary Judgment Standard

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial.  *See id*.  If the nonmovant fails to carry this burden, summary judgment is appropriate.  *See id*.

Mexico Academy seeks summary judgment dismissing plaintiffs' Free Speech claims. Mexico Academy asserts that the walkway contained school-sponsored speech, and that it did not

Defendants' Exhibit H.

[5]Section 414 states in pertinent part:

> Schoolhouses and the grounds connected therewith and all property belonging to the district shall be in the custody and under the control and supervision of the trustees or board of education of the district. The trustees or board of education may adopt reasonable regulations for the use of such schoolhouses, grounds or other property, all portions thereof, when not in use for school purposes or when the school is in use for school purposes if in the opinion of the trustees or board of education use will not be disruptive of normal school operations, for such other public purposes as are herein provided; except, however, in the city of New York each community school board shall be authorized to prohibit any use of schoolhouses and school grounds within its district which would otherwise be permitted under the provisions of this section. Such regulations shall provide for the safety and security of the pupils and shall not conflict with the provisions of this chapter and shall conform to the purposes and intent of this section and shall be subject to review on appeal to the commissioner of education as provided by law. The trustees or board of education of each district may, subject to regulations adopted as above provided, permit the use of the schoolhouse and rooms therein, and the grounds and other property of the district, when not in use for school purposes or when the school is in use for school purposes if in the opinion of the trustees or board of education use will not be disruptive of normal school operations . . . .

N.Y. Educ. Law § 414(1).

engage in viewpoint discrimination when it removed plaintiffs' bricks from the walkway.  Even if it did, Mexico Academy argues, its interest in avoiding disruption in the school environment and providing a religiously neutral environment and avoiding an Establishment Clause violation justified its removal of plaintiffs' bricks.  Plaintiffs oppose Mexico Academy's motion, and move for summary judgment on their Free Speech claim.  Plaintiffs claim that Mexico Academy engaged in impermissible view point discrimination and that defendants' asserted pedagogical concerns lack evidentiary support, and do not, as a matter of law, justify such discrimination. Plaintiffs further assert that leaving their bricks in the walkway would not have placed defendants in violation of the Establishment Clause.

### B.    Nature of the Forum

"Freedom to speak on government property is largely dependent on the nature of the forum in which the speech is delivered."  *Bronx Household of Faith v. Community Sch. Dist. No. 10*, 127 F.3d 207, 211 (2d Cir. 1997).  Fora for expression are classified in four categories which "correspondingly fall along a spectrum of constitutional protection", *Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625 (2d Cir. 2005), from highest to lowest:  the traditional public forum; the designated public forum, and its subset, the limited public forum; and the non-public forum. *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 142-43 (2d Cir. 2004).

In a traditional public forum, that is, places "held in trust" for public use, streets and parks, for example, the State may make content-based restrictions only if those rules are "'necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end.'"  *Id*. at 142 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

10

"A 'designated public forum' is a place not traditionally open to public assembly and debate - a public school, for example - that the government has taken affirmative steps to open for general public discourse." *Peck*, 426 F.3d at 626.  When, however, the State "'opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects'" it creates a "limited public forum".  *Hotel Employees & Rest. Employees Union Local 100 v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (quoting *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128, n.2 (2d Cir.), *cert. denied*, 525 U.S. 824 (1998) (internal quotation marks omitted).  Examples of limited public fora include state university meeting facilities opened for student groups, *see Widmar v. Vincent*, 454 U.S. 263, 267 (1981), open school board meetings, *see City of Madison Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n*, 429 U.S. 167, 174-76 (1976), city-leased theaters, *see Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555-56 (1975), and subway platforms opened to charitable solicitations, *see Young v. N.Y.C. Transit Auth.*, 903 F.2d 146, 161-62 (2d Cir.), *cert. denied*, 498 U.S. 984 (1990).  Rules governing the content of speech in a limited public forum must be reasonable and viewpoint-neutral.  *Hotel Employees*, 311 F.3d at 545-46.

A nonpublic forum is a government property that has not been opened for public speech either by tradition or by designation.  *See Perry*, 460 U.S. at 46.  In such a forum, the government may make a distinction in access on the basis of subject matter and speaker identity and "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."  *Id*.  Thus, courts will "uphold governmental restriction on speech in a nonpublic forum as long as the restriction is reasonable and viewpoint-neutral."  *Perry v.*

11

*McDonald*, 280 F.3d 159, 169 (2d Cir. 2001) (citing *Perry*, 460 U.S. at 46; *Cornelius v. NAACP*

*Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

Defendants do not seriously dispute that the walkway in this case is a limited public forum. Mexico Academy invited students, parents, alumni, and other members of the Mexico Academy community to purchase bricks. Local businesses and churches, as well as several colleges, also purchased bricks. Although Mexico Academy *intended* the bricks to contain inscriptions commemorating the purchaser, a student, or alumni, the only prohibitions it announced were vulgar, obscene, and "love interest" messages. Further, there is no evidence that, prior to 2000, Mexico Academy refused any inscription. Indeed, the walkway contains a wide array of commemorative and personal messages. In 2000, Mexico Academy passed a resolution to remove all bricks that contained political or religious messages and to prohibit inscriptions containing religious or political messages. From these facts, the Court concludes that Mexico Academy opened a portion of school property to public expression, so long as the inscriptions did not contain vulgar, obscene, or "love interest" messages, and thus created a limited public forum.

C.     **School-Sponsored Speech**

Mexico Academy argues that even if the walkway is a limited public forum, because individuals "might reasonably perceive" the brick walkway "to bear the imprimatur of the school", *Hazelwood Sch. Dist. v. Kuhlmeier* governs the nature of the constitutional protection to be accorded in this case. 484 U.S. 260, 271 (1988). Thus, defendants assert, they need not show that their decision to remove plaintiffs' bricks from the walkway was reasonable and viewpoint neutral; only that it was reasonably related to legitimate pedagogical concerns. In *Hazelwood*, the Court explained:

The question whether the First Amendment requires a school to tolerate particular student speech--the question that we addressed in *Tinker*--is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

Educators are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.

*Id*. at 270-71.  The *Hazelwood* Court added that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."  *Id*. at 273.

Plaintiffs argue that *Hazelwood* does not apply to this matter because the speech at issue was private and thus, as a matter of law, cannot be deemed school-sponsored.  Accordingly, the Court must consider whether the brick project and walkway may "fairly be characterized as part of the school curriculum", so as to bring this case within the purview of *Hazelwood*.

"[T]he Supreme Court has recognized that school administrators may exercise authority over 'expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school.'"  *Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ*., 42 F.3d 719, 723 (2d Cir. 1994) (quoting *Hazelwood*, 484 U.S. at 271).  In *Hazelwood*, the Court stated that activities may be defined as "curricular" even outside of the "traditional

13

classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences."  484 U.S. at 271.

Courts have reached differing conclusions regarding the applicability of *Hazelwood* in factually similar cases.  *Fleming* concerned a tile painting project in the hallways of Columbine High School which was designed to reacquaint students with the school after to horrific events that occurred there and to allow participants "to take part in the reconstruction of the school".  *Fleming v. Jefferson County Sch. Dist. R-1*, 298 F.3d 918, 931 (10th Cir. 2002).  The Tenth Circuit noted that in *Hazelwood*, the Supreme Court drew a "crucial distinction" between speech that "happens to occur on the school premises," and speech that a school "'affirmatively . . . promote[s]'".  *Id.* at 924 (10th Cir. 2002) (quoting *Hazelwood*, 484 U.S. at 270-71).  In *Fleming*, the court concluded that although "the variety and number of tiles would lead an observer to understand that the school itself did not paint the tiles", *id*. at 930, "[b]ecause the school permanently integrated the tiles into the school environment, and was significantly involved in the creation, funding, supervision, and screening process of the tile project" the tiles bore the imprimatur of the school.  *Id*. at 931.  The Tenth Circuit further found that the purpose of the tile project, to reacquaint students with the school and to allow individuals to help reconstruct the school, involved "the type of pedagogical interest with which *Hazelwood* was concerned" and stated that "the environment in which learning takes place, such as the school's hallways, can be a pedagogical concern as it affects the learning process."  *Id*.  Thus, the court concluded, *Hazelwood* applied.  *Id*; *see also Seidman v. Paradise Valley Unified Sch. Dist. No. 69*, 327 F.Supp.2d 1098, 1107 (D.Ariz. 2004) (finding that the elementary school's parent teacher's organization's program to raise funds for school playground equipment by selling parents

14

personalized tiles that would be permanently affixed to elementary school's halls fell within *Hazelwood*'s "broad definition of curriculum", because it was school-sponsored, and "undertaken for a primarily educational purpose (fundraising for school playground equipment)"); *but see Demmon v. Loudoun County Pub. Schs.*, 342 F.Supp.2d 474, 489-91(E.D.Va. 2004) (finding *Hazelwood* inapplicable because the inscribed bricks in the school's "walkway of fame", located near the main entrance of the high school, were not "school-sponsored" speech, because there was no evidence that the walkway was designed to impart particular knowledge and skills to the students, and the purposes of the walkway, which were to record student attendance and "commemorate a student's past accomplishments", did "not involve the type of pedagogical interest with which *Hazelwood* was concerned.").

        In this case, the evidence indicates that the purpose of the brick sale was to raise money for the Class of 1999's senior class trip, to allow students and community members to commemorate their relationship with Mexico Academy, and to raise money for and involve the community in the construction of a new brick walkway outside the entrance to the school.  The Class of 1999 class advisors and officers agreed to undertake the brick project and Superintendent Havens testified that the School Board "tacitly" approved the brick project.  While there is no evidence of a formal approval process, it is undisputed that faculty members, including the assistant high school principal and Superintendent Havens exercised some supervision over the project.  Plaintiffs argue that no individual could reasonably perceive the brick walkway to bear the imprimatur of the school because it bore a prominent sign stating that the bricks contained personal expressions of members of the Mexico Academy community.  Viewing the facts in the light most favorable to defendants, even though Mexico Academy took steps to distance itself

from the speech, a reasonable observer could conclude that Mexico Academy, which sponsored the project, was aware of and approved of (in the sense that it allowed) the content of each brick that is in the walkway.

As discussed, the activity must also be designed "impart particular knowledge or skills to student participants or audiences." *Hazelwood*, 484 U.S. 271.  Although there is no evidence regarding the particular knowledge or skills the fundraising project or the walkway itself were designed to impart, it can be reasonably inferred that Mexico Academy has an obligation to ensure that its physical premises are suitable for the purpose they exist to serve; the education of students.  Accordingly, the Court must determine whether Mexico Academy's reasons for removing or excluding plaintiffs' bricks from the walkway are "reasonably related to legitimate pedagogical concerns." *Id.* at 271.

In this case, Superintendent Havens testified that the School Board voted to remove the bricks and prohibit new bricks with religious inscriptions in order:  to remove itself from the brewing controversy and avoid disruption to the school environment; regain control of its forum and return the walkway to its intended use – the commemoration of "children and their graduations"; to limit the permissible subjects in the forum so as to avoid future controversy; and to avoid exposing students, who were a captive audience to the walkway, to a walkway which endorses a particular religion, in violation of the Establishment Clause.  In an affidavit Superintendent Havens further explains:

> I wish to state unequivocally that the purpose of the Board of Education and me in adopting and implementing the policy to remove the bricks that made specific reference to Jesus Christ, was so as to provide a religiously neutral environment for our students.  It was never our intention to open up our forum to all public discourse and debate.  It was always my opinion and I believe that of the Board of Education that this was a public school district whose primary mission was the education of all

16

students of all faiths.  We believe that it be simply inappropriate to allow exclusive religious bricks to be placed in the front of the school where students of all ages and backgrounds enter.  The bricks in question indicate that only a Christian God is Lord of the school.  We were endeavoring to strike a careful balance between the rights of all persons concerned when the Board directed the removal of the bricks.

Defendants' Exhibit H, Havens Aff. ¶ 34.

Viewing the evidence in the light most favorable to defendants, there is evidence that Mexico Academy's decision to exclude plaintiffs' bricks from the walkway was motivated by legitimate pedagogical concerns.  A fact-finder could conclude that it was reasonable for Mexico Academy to attempt to quell the controversy that was brewing and to avoid litigation and further disruption by excluding religious and political speech from the walkway.  Further, with regard to Mexico Academy's purported interest in avoiding the appearance of endorsing a particular religion to those students who crossed the walkway and were thus a captive audience, the Supreme Court has recognized that content-based restrictions may be reasonable "in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience."  *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304 (1974).

Defendants claim that because their reasons for removing plaintiffs' bricks are reasonably related to legitimate pedagogical concerns, they are entitled to summary judgment even if their decision was not viewpoint neutral.  In *Peck*, however, the Second Circuit concluded "that a manifestly viewpoint discriminatory restriction on school-sponsored speech is, prima facie, unconstitutional, *even if* reasonably related to legitimate pedagogical interests."  426 F.3d at 633.  Thus, the Court must consider whether there is evidence showing that Mexico Academy's enforcement of those interests was carried out in a non-viewpoint neutral manner.

   **D.      Viewpoint Neutrality**

17

While the government may reasonably restrict expressive activity in a limited public forum on the basis of content, it may not do so on the basis of the speaker's viewpoint, "speech discussing otherwise permissible subjects cannot be excluded . . . on the ground that the subject is discussed from a religious viewpoint." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001); *accord Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993).  Accordingly, the Court must determine what subjects were permissible in the walkway. The parties agree, and the record reveals, that bricks commemorating attendance, love for children, spouses, and teachers, sports teams, military service, churches, God, local businesses, colleges, and containing personal expressions such as "A Wild Life is Not Without Wildlife", "To Be or Not to Be", or  "Never Drive Your Angels Faster Than They Can Fly" were permissible. *See* Plaintiffs' Statement of Facts, ¶¶ 17-19 and Defendants' Response to Plaintiffs' Statement of Facts; Plaintiffs' Exhibit Q.

The inscriptions on plaintiffs' bricks all referred to Jesus and offered a specific religious viewpoint on God, an otherwise permissible subject.  Further, with regard to Mexico Academy's expressed intent to return the walkway to its original purpose, to commemorate students and graduations – and to limit the permissible subjects, the undisputed evidence shows that there remain a number of bricks which did not commemorate students, and concerned a wide array of subjects, "Go Yanks-Dolphins, Heat-Marlins-Canes, Panthers-Orangemen", "In God We Trust, The Roaricks'", and "Rev. Myrna Foster, and John Methodist Church Mexico, NY", for example. Finally, with regard to defendants' expressed intent to provide a religiously neutral walkway, and avoid the disruption that stemmed from allegations that Mexico Academy was endorsing religion and violating the separation of church and state, the evidence shows that bricks commemorating

Methodist, Episcopal, and Catholic Churches, all of which are Christian churches, were allowed to remain.  There is no evidence that any brick contained inscriptions relating to Jewish, Muslim, or any other religion.  Thus, the evidence indicates that Mexico Academy's decision was based on the viewpoint rather than the content of plaintiffs' bricks.  Accordingly, the Court concludes that even viewed in the light most favorable to defendants, the undisputed evidence demonstrates that Mexico Academy engaged in viewpoint discrimination when it removed plaintiffs' bricks from the walkway.

Defendants argue that even if they engaged in viewpoint discrimination when they removed plaintiffs' bricks from the walkway, their interest in avoiding disruption to the school environment, and providing a religiously neutral environment for their students and avoiding an Establishment Clause violation compelled their action.

The Second Circuit has stated:

> even so powerful a rule as that there must be viewpoint neutrality is subject to being trumped by the existence of a compelling state interest. And what is a compelling state interest is certainly informed by the fact of a school context and the presence of minor children. In gauging whether there is a compelling state interest though, courts must be exceedingly careful to be sure that the asserted compelling state interest is directly concerned with the state's desire to protect the children in the school and is not motivated by the wish to suppress speech the school and the state do not like.

*Peck*, 426 F.3d at 633, n.11.  Regarding defendants' conclusory assertion that its concern about the "potential for disruptions to the school's pedagogical mission", Defendants' Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment, p.5, justified any viewpoint discrimination, the Court finds there is no evidence from which a reasonable fact-finder could conclude that plaintiffs' bricks, other than interfering with school business to the extent litigation ensued, raised "the potential for disruptions" in the school.  Thus, the Court finds

defendants have failed to raise a material issue of fact as to whether their concern about disruption in the school was "a state interest so overriding as to justify, under the First Amendment, [Mexico Academy's] . . . viewpoint discriminatory censorship."  *Id*. at 633. Accordingly, the Court must consider whether evidence that the walkway, with plaintiffs' bricks, placed defendants in violation of the Establishment Clause.

### E.       Establishment Clause

The Establishment Clause "prohibits government from officially preferring one religious denomination over another:  'The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.'"  *Skoros v. City of New York*, 437 F.3d 1, 16 (2d Cir. 2006) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)).  Defendants state that they removed plaintiffs' bricks because they feared that they conveyed a message that Mexico Academy endorsed Christianity, rather than religious neutrality, in violation of the Establishment Clause.

A governmental practice which touches on religion does not offend the Establishment Clause if (1) it has a secular purpose, (2) it neither advances nor inhibits religion, and (3) it does not create an excessive entanglement of government with religion.  *See Lemon v. Kurtzman,* 403 U.S. 602, 612-13 (1971).  The Supreme Court has "been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools," *Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987).

### 1.       Purpose

In addressing the first prong of the test – whether the government's regulation serves a secular purpose – courts consider whether the government is legislating in such a way as to

20

abandon neutrality and to promote a particular religious point of view. *See Corporation of the Presiding Bishop v. Amos*, 483 U.S. 327, 335 (1987).  The secularity requirement "is not intended to favor the secular over the religious, but to prevent the government from 'abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.'" *Skoros*, 437 F.3d at 18 (quoting *Corporation of the Presiding Bishop*, 483 U.S. at 335)).

Defendants argue in their Memorandum of Law that Mexico Academy "has no secular purpose for permanently displaying sectarian messages affirming Jesus, and espousing a connection between Jesus and the school."  Defendants' Mem. of Law in Support of Motion for Summary Judgment, p. 17.  The uncontroverted evidence, however, viewed in the light most favorable to defendants, indicates that the purpose of the plan to sell bricks to Mexico Academy community members was to raise money for the Class of 1999's senior class trip to Disney World, and to fund construction of the walkway.  Further, although the evidence indicates that defendants, and those involved in the brick project, intended that the inscriptions on the bricks be commemorative in nature, the only prohibitions were against vulgar or profane language and "love interest" messages.  Superintendent Havens testified that profanity was prohibited because such language would be inappropriate in a walkway over which students passed, and that love interest messages were prohibited so that students would not memorialize relationships that might later dissipate.  Further, there is no evidence that, prior to removal of plaintiffs' bricks, Mexico Academy rejected any proposed inscription, even though some, "Girls!Girls!Girls!, Stan Birmingham", "Jon 1989', I Love You!!, Jodi 1991", "Marilyn Laws, If You Think You, Can You Can", "Sam Y Goldych, U S Air Force, 1949" were not commemorative, had "love interest"

messages, or contained personal expressions.  Thus, the Court concludes that the undisputed evidence demonstrates that defendants' conduct in installing the bricks serves a secular purpose.

That the actual purpose is secular does not end the inquiry.  In *McCreary County v. ACLU*, 125 S.Ct. 2722, 2734 (2005), the Supreme Court instructed that courts must examine how "an 'objective observer,' one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act" would perceive the school's purpose.  In this case, the intended audience for the walkway is all who enter the Mexico Academy High School, which obviously includes students, who, according to the record, range from kindergartners to high school seniors.  The Second Circuit has recently instructed that in such cases, "we assume the objective observer is an adult who, in taking full account of the policy's text, history, and implementation, does so mindful that the displays at issue will be viewed primarily by impressionable schoolchildren."  *Skoros*, 437 F.3d at 23.  This standard "strives to identify 'a personification of a community ideal of reasonable behavior determined by the collective social judgment.'"  *Id*. at 24 (quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. at 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment) (alteration and internal quotation marks omitted)).  In doing so, however, the Court should not "turn a 'blind eye' to the fact that schoolchildren are the intended audience for the challenged displays".  *Id*.

Superintendent Havens stated that although he was concerned about the brick which stated "Jesus Saves, John 3:16", it was allowed to remain in the walkway because he thought removal might "cause real distress for the community."  Superintendent Havens testified that despite Establishment Clause concerns, he was not aware of any brick which had been purchased that had

not been placed in the walkway.  Superintendent Havens stated that because of the complaints regarding the religious inscriptions, the School Board, after consulting with counsel, voted to place a sign in the walkway stating that the "messages on this walk are personal expressions and contributions of the individuals of  Mexico Academy and Central School community."  The evidence in this case uniformly shows that an objective observer, one who was familiar with the commencement of the brick project, the initial guidelines, the implementation, and response to complaints from community members about the bricks, including the erection of a sign stating that the bricks contained the personal expression of individuals in the Mexico Academy community, would conclude that Mexico Academy's purpose was secular in nature and that school officials recognized that once they had opened their walkway to personal expression, they were bound to include all requested inscriptions.  In short, there is no evidence from which an objective observer could conclude that Mexico Academy's acceptance of bricks with religious messages were a covert effort to promote Christianity.  Thus, the Court concludes that the first prong of the *Lemon* test is satisfied because the actual and perceived purpose of the brick walkway and the practices and policies which allowed plaintiffs' bricks in the walkway are secular: to raise money for the senior class trip; to raise money to install a new walkway; to ensure the messages on the bricks were appropriate for students; and permitted personal messages.

### 2.    Effect

To satisfy the second prong of the *Lemon* test, the government is required to show that (1) it did not act with the purpose of advancing or inhibiting religion; and (2) the action does not have the effect of advancing or inhibiting religion.  *See Agostini v. Felton*, 521 U.S. 203, 222-23

(1997).  In this respect, the government's conduct must not evince a preference for "those who believe in no religion over those who do believe," or convey a message of government disapproval of religion or hostility toward religion.  *School Dist. of Abington Twp., Pa.  v. Schempp*, 374 U.S. 203, 225 (1963).

The undisputed facts, as discussed above, indicate that Mexico Academy did not act with the purpose of advancing or inhibiting religion.  Indeed, defendants initially allowed the installation of plaintiffs' bricks, like every other brick in the walkway.  Although the evidence indicates Superintendent Havens became concerned after plaintiffs' bricks were installed, there is no evidence that any school official made any conscience determination about whether to permit the installation of plaintiffs' bricks in the first instance.  The process concerned no more than permitting the bricks, with personal messages with no indication that the message should or should not contain religious expressions.  Thus, the evidence indicates that Mexico Academy's conduct did not evince a preference for Christianity, or for religion over non-religion.

Defendants are most concerned with the second part of the endorsement analysis.  They contend that the walkway, as it was before plaintiffs' bricks were removed, has the effect of advancing or endorsing a preference for Christianity, more specifically, that it would lead students, who crossed the walkway daily, to think that Mexico Academy believed that "Ye must be born again, Jesus Christ".

A court reviewing an Establishment Clause challenge must consider "whether a 'reasonable observer . . . aware of the history and context of the community and forum in which the religious display appears,' would understand it to endorse religion . . . or one religion over another."  *Skoros*, 437 F.3d at 30 (quoting *Capitol Square*, 515 U.S. at 780).  When the

challenged conduct occurs in the setting of a public school, "special concerns arise in the

identification of a reasonable observer." *Id*. In *Skoros*, the Second Circuit concluded, in view of

the range of the students to whom the challenged policy applied, that the:

> relevant objective observer, whether with respect to purpose or effect, is an adult who
> is "aware of the history and context of the community and forum in which the
> religious display appears" *Capitol Square*, 515 U.S. at 780 (O'Connor, J., concurring
> in part and concurring in the judgment), . . . and who understands that the display of
> a religious symbol in a school context may raise particular endorsement concerns,
> because of the pressure exerted on children by the "law of imitation," *Illinois ex rel.
> McCollum v. Bd. of Educ.*, 333 U.S. at 227 (Frankfurter, J., concurring).

*Id*. at 30-31.

It is apparent from defendants' submissions that Mexico Academy is concerned not only

with providing a religiously neutral environment for its students, but also about the effect on

schoolchildren of the evangelistic nature of the inscriptions of the bricks at issue in this case,

which state "Jesus Saves!, Joshua Russell", "Jesus Christ The Only Way!, Rev. Ron Russell",

"Jesus Loves You, Susie Russell", "Jesus Christ is Lord, Rev. Ron Russell", "Ye Must Be Born

Again, Jesus Christ", "Jesus loves you, Ron Russell", "Jesus Saves", and "Ye Must Be Born

Again", and "Jesus Saves, John 3:16".[6] To the extent the evangelistic nature of the inscriptions

---

[6] The Supreme Court, in assessing *viewpoint neutrality*, has so far rejected the treatment of speech that is "decidedly religious in nature" or "quintessentially religious" as "different[t] in kind" from other permitted activities and instead "reaffirm[ed] [the Court's] holdings in *Lamb's Chapel* and *Rosenberger* that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." *Good News Club*, 533 at 111-12; *see also Bronx Household of Faith v. Board of Educ. of the City of New York*, 331 F.3d 342, 355 (2d Cir. 2003) (recognizing that the district court's conclusion that "the distinction between worship and other types of religious speech cannot meaningfully be drawn" is "in obvious tension with our previous holding that such a distinction may be drawn" but noting that *Good News Club* "seriously undermined" though did not explicitly reject the proposition.). Because plaintiffs' bricks contain the personal expression of community members, which is permissible in the walkway, and concern God, which is also permissible in the walkway, the Court does not draw a distinction based on the evangelistic nature of the messages. Indeed, there are other bricks with inscriptions which promote issues obviously important to the speaker, George M. Wise, Class of 1948, Praise God" and "Go Yanks-Dolphins, Heat-Marlins-Canes, Panthers-Orangemen", for example.

are relevant to the Establishment Clause inquiry on the basis that schoolchildren would feel coercive pressure as a result of those bricks, *cf. Lee v. Weisman*, 505 U.S. 577, 592-93 (1992), defendants have not adduced any evidence indicating that these bricks would have - or had - that effect.  To be sure, students are a captive audience to the walkway, and it is undisputed that students as young as kindergartners cross the walkway which leads to the high school.  There is no evidence how many do, or how often.  Further, for the reasons discussed below, because there is no evidence that the walkway has the effect of endorsing Christianity, the Court "cannot say the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility toward the religious viewpoint" as a result of the exclusion of plaintiffs' bricks.[7]  *Good News Club*, 533 U.S. at 118.

Mexico Academy argues that when an observer viewed the content of the bricks, together with the disclaimer, he or she could reasonably perceive Mexico Academy to be endorsing Christianity because the "wording" of the sign (which both parties refer to as a "disclaimer"), which states that "The messages on this walk are personal expressions and contributions of the individuals of Mexico Academy and Central School community", can "reasonably be interpreted as expressing an endorsement of the views on the bricks by Mexico Academy and Central School community."  Defendants' Responsive Mem. of Law in Opp. to Plaintiffs' Motion for Summary Judgment, p. 11.  Therefore, defendants argue, the objective effect of the walkway is an endorsement of Christianity.[8]  The Court disagrees.  The sign expressly states that the messages

---

[7] There is no evidence of this, either.

[8] Defendants cite *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring) for the proposition that the Court must also examine the objective component of the message Mexico Academy communicated by including plaintiffs' bricks in the walkway:

> The meaning of a statement to its audience depends both on the intention of the speaker and on the "objective" meaning of the statement in the community. Some listeners need not rely

on the bricks are the "personal expressions" of "individuals" of the Mexico Academy and Central School community, informing anyone who crossed the walkway that the inscriptions were by individuals and were personal, and thus even if authored by school officials, were not official expressions.

The evidence also shows that from the beginning, Mexico Academy provided everyone in the community with the opportunity to purchase a brick, and in return, he or she could choose an inscription.  There is no evidence that Mexico Academy exercised any supervision over an individual's formulation of an inscription or refused any proposed inscription.  The purchaser paid for the brick and contributed to the cost of installation.  The bricks at issue in this case contain religious, and even evangelistic, messages.  Although several of the bricks do not contain the name of the purchaser or any other individual to whom an observer could immediately attribute the speech, the disclaimer, which the parties agree is "prominently" located, would inform viewers that the inscriptions were the "personal expression" of "individuals" of the Mexico Academy community.  Further, the bricks at issue, which number 9 among 1,736, literally

---

solely on the words themselves in discerning the speaker's intent: they can judge the intent by, for example, examining the context of the statement or asking questions of the speaker. Other listeners do not have or will not seek access to such evidence of intent. They will rely instead on the words themselves; for them the message actually conveyed may be something not actually intended. If the audience is large, as it always is when government "speaks" by word or deed, some portion of the audience will inevitably receive a message determined by the "objective" content of the statement, and some portion will inevitably receive the intended message. Examination of both the subjective and the objective components of the message communicated by a government action is therefore necessary to determine whether the action carries a forbidden meaning.

The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid.

As discussed above, even applying this analysis, the objective meaning would not convey a message of endorsement.

constitute an insignificant part of the walkway.  *Cf.  Capitol Square*, 515 U.S. at 777 (O'Connor,

J., concurring) ("At some point . . . a private religious group may so dominate a public forum that

a formal policy of equal access is transformed into a demonstration of approval.").  Although the

setting in this case does not neutralize the content of plaintiffs' bricks, which can only be

characterized as religious, and even evangelistic, the wide variety of messages negates any

message of endorsement of that content.  Further, the evidence shows that Mexico Academy took

steps to divorce itself from the religious speech and to attribute the speech in the walkway to

individuals by erecting a sign stating that the messages in the walkway were the personal

expressions and contributions of the individuals of the Mexico Academy community.  Thus, the

Court concludes, based on the undisputed evidence, that an objective observer aware of the

history of the walkway, Mexico Academy's purposes, the wide variety of the bricks in the

walkway, and who understands the endorsement concerns that arise in a school context where

impressionable students may observe bricks with Christian messages, would perceive the effect of

the walkway to be a collection of personal expressions and commemorative messages on many

topics, including religion, not an endorsement of any particular religion, or of religion over non-

religion.[9]  *See Marchi v. Board of Cooperative Educ. Serv. of Albany*, 173 F.3d 469, 476 (2d Cir.

1999) ("When courts adjudicate claims that some governmental activity violates the

Establishment Clause, they must be careful not to invalidate activity that has a primary secular

---

[9] To the extent political divisiveness is relevant evidence of perceived endorsement, the evidence in this case, even if credited, would not establish this prong.  Superintendent Havens testified that in addition to the complaints by Ms. Passer who was concerned about the separation of church and state, he received other complaints by concerned community members, including one who was concerned about walking on a brick inscribed Jesus, an inquiry from Senator Schumer's office, and a threat to sue by the American Civil Liberties Union.  The Supreme Court, however, has not held that "political divisiveness alone can serve to invalidate otherwise permissible conduct."  *Lynch*, 465 U.S. at 684.

purpose and effect and only incidental religious significance."). Accordingly, the Court turns to the third prong of the *Lemon* test.

### 3. Entanglement

The third prong of the *Lemon* test requires the Court to consider whether the challenged state action "foster[s] excessive state entanglement with religion." *Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 425 (2d Cir. 2002). To determine whether the entanglement is excessive, the Court "must examine the character and purposes in the institutions that are benefited" and evaluate the resulting relationship between the government and religious authority. *Lemon*, 403 U.S. at 615. Defendants claim their policy of allowing religious speech, namely speech about Jesus, and the conflict which arose as a result of their inclusion of these bricks, excessively entangle it with religion. "Entanglement is a question of kind and degree." *Lynch v. Donnelly*, 465 U.S. 668, 684 (1984). "[T]he First Amendment does not prohibit all interaction between church and state. The entanglement of the two becomes constitutionally 'excessive' only when it has 'the effect of advancing or inhibiting religion.'" *Skoros*, 437 F.3d at 36 (quoting *Agostini*, 521 U.S. at 233). The entanglement analysis is "properly treated as 'an aspect' of *Lemon*'s second-prong 'inquiry into a statute's effect.'" *Id.* (quoting *Agostini*, 521 U.S. at 233). The relevant factors are "'the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority.'" *Agostini*, 521 U.S. at 232 (quoting *Lemon*, 403 U.S. at 615).

Here, the only aid Mexico Academy provides is the opportunity to purchase a brick and a 4" x 8" area on which to inscribe a message. The aid to churches or individuals who belong to a particular faith is no different than that provided to any other business or individual. The

resulting relationship is permanent because the inscriptions tie together Mexico Academy and the purchaser of the bricks, which, in this case, includes individuals, businesses, colleges, and churches.  The resulting relationship, however, requires no maintenance or even communication between Mexico Academy and the individual purchasers.  Thus, even viewing the facts in the light most favorable to defendants, a reasonable fact finder could not conclude that Mexico Academy's policy and installation of plaintiffs' bricks created excessive entanglement.

In *Rosenberger v. Rector and Visitors of University of Virginia* the Supreme Court stated, "the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse."  515 U.S. 819, 839 (1995).  In this case, Mexico Academy extended an invitation to all members of its community to purchase a brick and have a message inscribed.  There is no evidence that, prior to the decision to remove plaintiffs' bricks, Mexico Academy rejected any proposed inscription.  Such a neutral scheme, which resulted in a walkway containing personal expressions of all kinds, including religious messages, does not offend the Establishment Clause.  "More than once have we rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design."  *Id*. Thus, the Court concludes that the undisputed facts in this case, even viewed in the light most favorable to defendants, do not implicate a valid Establishment Clause defense or a compelling state interest that would justify viewpoint discrimination.  Accordingly, defendants' motion for summary judgment on plaintiffs' Free Speech claim is denied and plaintiffs' motion for summary judgment on their Free Speech claim is granted.

**F.     Preliminary Injunction**

Since plaintiffs are entitled to judgment on their first cause of action, violation of their

Freedom of Speech, they are also entitled to injunctive relief directing the installation of their

bricks.

**V.     CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment is **DENIED**; and it is further

**ORDERED** that plaintiffs' motion for summary judgment on their Free Speech claim

(First Cause of Action in the Amended Complaint) is **GRANTED**; and it is further

**ORDERED** that plaintiffs are entitled to injunctive relief in the form of a preliminary

injunction (as all the claims in this case have not been disposed of) directing the return of their

bricks to the walkway; and it is further

**ORDERED** that plaintiffs are directed to submit a proposed order of preliminary

injunction within five days of the date of this Memorandum-Decision and Order; and it is further

**ORDERED** that plaintiffs are directed to file a status report with the Court regarding

whether they intend to pursue their remaining causes of action within five days of the date of this

Memorandum-Decision and Order.

**IT IS SO ORDERED.**

Dated: March 31, 2006
       Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge

31